IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS AMARILLO DIVISION

| | | |
|---|---|---|
| ARMEN ALEX GRIGORYAN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  DEC 19 2025 PH4:00 |
| | ) | FILED - USDC - NDTX - AM |
| vs. | ) | |
| | ) | |
| (1) WHEELER COUNTY, a political | ) | 2-25CV-276-Z |
| subdivision of Texas | ) | |
| (2) TIM REEVES, in his official | ) | |
| capacity, | ) | |
| (3) FRANKLIN MCDONOUGH, | ) | |
| in his official capacity, | ) | |
| (4) DALE COLE, | ) | |
| (5) LEVI HAVENS, | ) | |
| (6) TIMOTHY PYLE, | ) | |
| | ) | |
| | ) | |
| | ) | ATTORNEY LIEN CLAIMED |
| Defendants. | ) | JURY TRIAL DEMANDED |

## PETITION

01.        COMES NOW, the Plaintiff Armen Alex Grigoryan ("Plaintiff", "Mr.

Grigoryan" or "Armen"), and for his Complaint against Defendants, alleges and states as

follows:

## INTRODUCTORY STATEMENT

02.    Plaintiff Armen Grigoryan was born in Yerevan, Armenia.

03.    He was born to a hardworking family that immigrated to the United States

through the Diversity Immigration Visa Program (Green Card Lottery) in 2000.

04.     The Diversity Visa Program is a highly selective, congressionally created process

that grants permanent-resident status to individuals from countries with historically low rates of

1

immigration to the United States. Only a small percentage of applicants worldwide are selected each year. Armen and his family were among those selected, allowing them to lawfully enter the United States, establish permanent residence and, after fulfilling all statutory requirements, to become naturalized U.S. citizens.

05.    This move by the Grigoryan's was influenced primarily by the widespread corruption and economic crisis in Armenia, which occurred after the collapse of the Soviet Union. The corruption throughout the country affected many sectors of life for everyday citizens. Federal and local governments, judiciary, and banking/financial institutions were riddled with widespread corruption.

06.    While residing in Armenia, on two separate occasions Mr. Grigoryan's father and grandfather each had more than $100,000.00 dollars taken directly from their respective bank accounts without their consent.

07.    In other words, each incident involved the theft of over $100,000.00 from the separate accounts of Armen's father and grandfather, and no legal means existed for the Grigoryan family to recover the stolen funds.

08.    This is ultimately what caused Armen's family and many other Armenians to have a great distrust in financial institutions. Therefore, most business transactions in Armenia are transacted with cash, which Armen's father still preferred cash transactions due to his experiences in Armenia. This corruption and distrust was a major catalyst for the family's move to America.

09.    Armen was only 17 years old when he and his family immigrated to the United States in hopes of achieving the American dream. Armen was determined to build a life in a

2

country that honors hard work; safeguards its citizens civil rights and protects its citizens from government corruption

10. Shortly after settling in California, Armen and most of his family enrolled at Glendale Community College to take English as a Second Language (ESL) classes.

11. While working full-time at a construction company as a laborer and taking ESL classes, Armen also took business, mechanics, and construction classes. This demanding schedule often required him to work 12-to-16-hour days. These long hours became his new normal life as he worked tirelessly to support his family and develop a broad set of skills, including extensive knowledge of construction.

12. A few years later, Armen's hard work paid off. In 2006, Armen, his father Gagik, and his brother Arthr pooled their resources and obtained a line of credit to purchase Baseline Lube Oil Inc. (hereinafter, "Baseline Oil"), a business located in Pomona, California.

13. The Grigoryan family decided to purchase Baseline Oil because they had previous experience in the automotive chemical industry. It took significant efforts to make the company profitable and a success.

14. Baseline Oil now distributes its products in 14 different states to numerous automotive shops, including NAPA Auto Parts; AutoZone, and O'Reilley Auto Parts. The company sells various automotive chemicals such as brake fluid, coolant, and oil. Its annual gross profits are approximately $3,000,000.00.

15. Armen, as general manager, is a critical part of the family business's success. He is responsible for the company's warehouse, oversees the distribution process; prepares all outgoing orders; and maintains comprehensive knowledge of company inventory. His brother, Arthr by contrast, is the chief financial officer who handles the administrative and financial

3

matters of the company, including bookkeeping, vendor communications, payroll, budgeting and marketing. Armen's and his brother's respective roles are the backbone of the company's operations.

16.    Armen is the individual behind the scenes who executes the company's daily operations in order to run effectively and efficiently. He is the only member of the family who possesses full operational knowledge. As a result of Armen's arrest, the company's operations were effectively brought to a halt.

## PARTIES

17.    Plaintiff Armen Alex Grigoryan was and is at all times relevant to this Complaint a citizen and resident of the State of California. He currently resides in Los Angeles County, California.

18.    Defendant Wheeler County ("Wheeler County" or "Defendant Wheeler County"), Texas, is a political subdivision of the State of Texas, organized and existing under the laws of the State of Texas. "We add that a county enjoys no § 1983 immunity regardless of any qualified immunity that might be afforded its officials." *Turner v. Upton County*, 915 F.2d at 133, 136 (5th Cir. 1990). Wheeler County was the employer of all defendants named herein and was and is at all times relevant to this Complaint responsible for the policies, practices, and customs of the Wheeler County Sheriff's Office (hereinafter, referred to "WCSO").

19.    Defendant Franklin McDonough was and is the elected District Attorney for the 31ᵗ Judicial District, which includes Wheeler County. He is a party to the suit in his official capacity. An official-capacity suit "... is, in all respects, other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Under binding Fifth Circuit precedent, official-capacity suits against a locally elected district attorney are treated as *Monell*

4

municipal-liability claims requiring proof of an official policy; widespread custom; failure to train or supervise; or a final policymaker decision that was the moving force behind the constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Baker v. Putnal*, 75 F.3d 190, 195-96 (5th Cir. 1996); *Peña v. City of Rio Grande City*, 879 F.3d 613, 621-22 (5th Cir. 2018). As the final policymaker for charging decisions, training, supervision, and disclosure practice regarding charging decisions, and disclosure practices within the District Attorney's Office, Defendant McDonough's policies, customs, training failures, supervisory decisions, omissions, and prosecutorial decisions including the initiations and continuation of criminal charges without probable cause constitute official Wheeler County policy for 42 U.S.C. § 1983 purposes.

20.    Defendant Tim Reeves, Wheeler County Sheriff (herein after "Sheriff Reeves") is a resident of the State of Texas. "[I]t has long been recognized that, in Texas, the county sheriff is the county's final policy maker in the area of law enforcement" by virtue of the sheriff's election to office." *Turner* 915 F.2d at 136-38 (5th Cir. 1990) (citing *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980). Sheriff Reeves was at all times relevant hereto, acting under color of state law, and in the scope of his employment, as a sheriff and supervisor employed by Wheeler County.

21.    Defendant Dale Cole (hereinafter, "Deputy Cole"), a WCSO deputy sheriff, is a resident of the State of Texas. Deputy Cole was at all times relevant hereto, acting under color of state law, and in the scope of his employment, as a canine handler.

22.    Defendant Levi Havens (hereinafter, "Deputy Havens") is a resident of the State of Texas. Deputy Havens was at all times relevant hereto, acting under color of state law, and in

the scope of his employment, as a deputy sheriff employed by Wheeler County and/or Wheeler County Sheriff's Office.

23.     Defendant Timothy Pyle (hereinafter, "Deputy Pyle") is a resident of the State of Texas. Deputy Pyle was at all times relevant hereto, acting under the color of state law, and in the scope of his employment, as a deputy sheriff employed by Wheeler County and/or  Wheeler County Sheriff's Office.

## JURY DEMAND

24.     Pursuant to the Seventh Amendment of the United States Constitution, Mr. Grigoryan requests a jury on all issues and claims outlined in the Complaint.

## JURISDICTION AND VENUE

25.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivation of rights secured by the Fourth and Fourteenth Amendments of the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under the color of law.

26.     This Court also has original jurisdiction under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly under the Fourth Amendment and/or the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

27.     The Acts complained of herein occurred in Wheeler County, Texas. Jurisdiction and venue are proper under 28 U.S.C. §§ 116(a) and 139 (b).

## FACTUAL BACKGROUND

28.    On November 19, 2021, Armen's father, Gagik, arrived at Armen's home in Glendale, California, to pick him up for their trip to Horseshoe Bend, Arkansas. Armen loaded his clothes and personal items into the van's rear cargo area alongside his father's, items his faher had loaded previously were already in the van. He was accompanying his father because he had recently suffered two heart attacks and had only recently recovered from COVID-19. He did not speak English proficiently, making Armen's assistance necessary to effectively and efficiently conduct business.

29.    The purpose of the trip was to begin development of a real estate investment property that the family had recently purchased. The planned structure was to be approximately 49,000 square feet. The purchase and planned development was motivated by the post-COVID-19 housing boom, which the family viewed as a promising new business venture.

30.    In addition to his role in the family's business, Baseline Oil, Armen possessed extensive knowledge of construction. This knowledge was an important factor in his decision to accompany his father on the trip, as he was able to assist with matters requiring technical understanding and evaluation.

31.    Shortly after Armen and his father arrived in Horseshoe Bend, on November 23, 2021, Armen's wife called him, urging him to come home for Thanksgiving because she had invited many in their family and close friends to their home. Armen originally planned to remain in Arkansas through the holidays, but after persistent persuasion, Armen's wife convinced him to come home for Thanksgiving and drive back the following day.

32.    Thus, midmorning on November 24, Armen started his trip back home to Glendale, California, in Los Angeles County. His intention was to go home for Thanksgiving and immediately return to Arkansas to continue helping his father.

33.    However, it was not to be. Mr. Grigoryan and his family's aspirations of developing the real estate investment property were thwarted on November 24, 2021. On that day, Mr. Grigoryan was stopped in Wheeler County, and after consenting to a vehicle search, he was arrested for Money Laundering.

34.    While Plaintiff was seated in Deputy Pyle's patrol vehicle, Deputy Pyle requested Armen's consent to search the van. Armen voluntarily consented immediately. He remained in the patrol vehicle alone while the Deputies Pyle and Havens returned to the van to conduct the search.

35.    During the search, the Deputies located bundled currency in trash bags in the rear of the van. None of the following were found: contraband, drugs, paraphernalia, weapons, drug residue or ledgers indicative of illegal activities.

36.    Upon locating the currency, Deputy Havens exclaimed, *"Ahh fuck yeah, big money load,"* and subsequently he and Deputy Pyle high-fived each other, which unveiled their motivation and purpose. Therefore, the deputies immediately arrested Plaintiff and transported him to the Wheeler County Jail, despite knowing that the search had revealed no evidence establishing probable cause for any offense or justify a warrantless arrest as required by Texas Code of Criminal Procedure, Article 14.03.

37.    Deputy Pyle executed and swore to the truthfulness of a Probable Cause Affidavit (see Exhibit A, which is hereby incorporated by reference), which omitted material exculpatory facts and contained no facts establishing probable cause for a legal warrantless arrest, and any criminal culpability. Rather, the affidavit contains significant inaccuracies and omissions. Deputy Pyle's Incident Report contradicts itself by falsely stating Armen "said he traveled to Kansas," demonstrating the unreliability of the Deputy Pyle's Incident Report.

Further, Plaintiff never gave inconsistent answers or exhibited anxiety in his explanations. Additionally, Armen's statements gave no indication of the $122,000.00 in the back of the van. He consistently stated that he carried some cash behind the driver's seat because his bank cards frequently become blocked whenever he travels outside California.

38.     Thereafter, District Attorney Franklin McDonough initiated the malicious prosecution of Mr. Grigoryan by filing a criminal case of Money Laundering with the District Attorney relying on the said affidavit and incident report none of which contains any legal justification for the warrantless arrest of Armen, let alone sufficient facts to support a criminal charge and prosecution. Therefore, District Attorney Franklin McDonough failed to use his independent legal and ethical judgment nor due diligence by initiating the malicious prosecution of Mr. Grigoryan.

39.     Further, District Attorney McDonough relied on WCSO incident reports and Deputy Pyle's Probable Cause Affidavit, which omitted material exculpatory facts. For instance, Mr. Grigoryan had disclosed to the sheriff deputies the fact that his family owned and operated a multimillion-dollar automotive-chemical distribution company that served fourteen states. These facts do not support and are not consistent with narcotics trafficking which is highly relevant and support the legitimacy of the source of the currency. These material misstatements also confirm that the Affidavit lacked any factual basis for probable cause and that deputies and the District Attorney constructed a narrative to justify their predetermined seizure based on their criminal interdiction and highway-interdiction policies and procedures, as well as WCSO's revenue-driven forfeiture interdiction practices, based on pure speculation rather than relying on articulable facts, probable cause and evidence.

**Mr. Grigoryan's Prosecution**

9

40. All previous paragraphs are incorporated herein by reference.

41. Shortly after his arrest, Mr. Grigoryan was indicted for money laundering with funds valued at $30,000.00 or more but less than $150,000.00, a third-degree felony. However, Mr. Grigoryan was innocent as confirmed by the Texas Seventh Court of Appeals. Indeed, there was no evidence to arrest, indict or convict Mr. Grigoryan of knowingly possessing the proceeds of criminal activity, namely, selling a controlled substance. Nevertheless, Deputy Timothy Pyle persisted and continued the criminal process against Mr. Grigoryan, by submitting the Probable Cause affidavit, which is full of material omissions and testifying against him in his trial. Mr. Grigoryan waived jury and elected a bench trial. At trial, the state presented both arresting deputies as witnesses. WCSO Deputy Sheriff Cole testified as an expert witness as a canine handler. During his testimony, he invoked the "totality of the circumstances" over a dozen times.

42. As a result of the false charges and unconstitutional actions of District Attorney McDonough and WCSO, Mr. Grigoryan suffered profound personal and financial harm. He lost $122,000.00 in lawfully possessed currency; the van, and numerous valuable personal belongings. The van and his personal items have never been returned to Mr. Grigoryan. Although he was probation eligible, Judge Emmert convicted him of the criminal indictment and sentenced him to eight years' confinement in prison and assessed an $8,000.00 fine. The Grigoryan family's previously solid and well-established business reputation was severely damaged. Multiple companies immediately ceased doing business with the family's company, Baseline Oil, causing a significant loss of income and economic opportunity. Armen was wrongly convicted but was ultimately vindicated on December 20, 2023, by the Seventh Texas Court of Appeals, which *reversed* the trial court and *rendered an acquittal* due to insufficient evidence. Further, the

10

family's real estate development plans in Arkansas ceased and never materialized causing further economic loss and opportunity.

43.    The weight of the false accusations of money laundering left Mr. Grigoryan suffering depression and anxiety. He was emotionally devastated. Once a successful and respected businessman, Armen was now a broken man struggling to hold his life together, and he was forced to pick up the pieces after a wrongful prosecution and conviction.

44.    Mr. Grigoryan has initiated this action in an effort to bring some semblance of justice for the egregious violation of his civil rights. He hopes that this lawsuit will expose the truth of his plight and prevent law enforcement officers from wrongfully accusing innocent citizens of serious crimes and wrongfully seizing their property without sufficient evidence.

### Mr. Grigoryan's Criminal Trial

45.    On January 9, 2023, Armen appeared in the 31st Judicial District Court of Wheeler County, Texas, for a bench trial on the charge of money laundering with funds valued at $30,000.00 or more but less than $150,000.00, a third-degree felony.

46.    Although entitled to a jury, Armen elected to proceed before the Court, believing that a trained judicial officer would be better at evaluating the evidence according to law and remain neutral, unbiased, avoiding possible ethnic prejudices, and require the State to meet its burden of proof beyond a reasonable doubt.

47.    However, the proceedings that followed revealed a hurried, irregular, and deeply flawed adjudication rather than the fair trial Armen was entitled.

48.    The trial was commenced by Steven Emmert, 31st District Judge, without reading the indictment against the defendant. The judge stated on the record that he was not paying attention to the proceedings.

11

49.     While Armen was on the stand testifying during his trial, Judge Emmert, who has a duty to avoid impropriety and the appearance of the same, began using his cell phone on the bench, which began playing loud audio sounds. Judge Emmert, embarrassingly, admitted that he was searching for information on the Internet to determine the distance from Horseshoe Bend, Arkansas, where Armen had been stopped by WCSO in Wheeler County. Thus, the Judge was improperly seeking information that was not in evidence. He had surely instructed countless juries, as triers of fact, to not use their cell phones during court proceedings so that their attention would not be distracted, and more importantly, not to seek or consider information that was not presented in open court.

50.     The state's evidence in the guilt-innocence phase was limited to two witnesses: Deputy Timothy Pyle and Deputy Dale Cole, the canine handler. No drugs, paraphernalia, residue, ledgers, weapons, scales or contraband indicative of illegal drug activity were recovered. Further, the State presented no forensic evidence, confession, or any evidence connecting the currency to any specific criminal activity. Its theory rested on speculation, general references to "training and experience," and the presence of currency alone. Possession of United States currency is not illegal, no matter how it's packaged.

51.     At the conclusion of closing arguments, without commencing into the statutorily required punishment phase of the trial, the Judge immediately found Armen guilty and sentenced him to eight years imprisonment and an $8,000.00 fine. Judge Emmert did this without allowing Mr. Grigoryan to present any evidence regarding punishment. Before the judge could complete the announcement of guilt and sentencing, the prosecutor interrupted to inform the court that the proceeding was required to be bifurcated and a punishment phase is required.

12

52.     The judge acknowledged the mistake, responding, "I don't know what I was thinking except that I need to get to Pampa."

53.     In other words, the court's initial sentencing occurred prematurely and was halted only because the prosecutor intervened. On the record, the Judge attributing his error to the fact that he was in a hurry to leave. After the punishment phase, the Court again imposed the same verdict of 8 years of incarceration and an $8,000 fine.

**Testimony of Deputy Timothy Pyle**

54.     Deputy Timothy Pyle was one of the arresting officers and testified as the State's first witness.

55.     Deputy Pyle presented himself as a highway-interdiction-trained law enforcement officer, emphasizing the specialized courses, HITS training, and criminal-interdiction programs he had completed before or while working on Interstate 40 as a criminal-interdiction deputy.

56.     Deputy Pyle described Interstate 40 as a route used by "frequent drug couriers going down Interstate 40" to "smuggle large amounts of narcotics or persons." He testified that his interdiction experience on the roadway shaped how he interpreted the items he observed in the van.

57.     During this testimony, Deputy Pyle constantly prefaced his answers with his "training and experience" and "totality of the circumstances." In fact, during testimony of Deputy Pyle, District Attorney McDonough encouraged and coached the deputy to do so:

> "Totality of the circumstances" was invoked over a dozen times, prompting defense counsel to ask that the record reflect the prosecutor was coaching the deputy by nodding his head, and in a separate instance stating, "you can say the totality of the circumstances all you want. I'm sure you talked to counsel about that." See Exhibit B
> See *Grigoryan v. State*, No. 07-24-00046-CR, slip op. at n.4 (Tex. App.—Amarillo [7th Dist.] 2024) (mem. op., not designated for publication).

13

Rather, Deputy Pyle made "conclusory statements" speculating that Mr. Grigoryan was involved in criminal activity due to his interdiction training rather than the objective and articulable facts indicating that Mr. Grigoryan was involved in any sort of criminal activity.

58.    Deputy Pyle stated that on the night of November 24, 2021, he and Deputy Havens were positioned on the median of I-40 when they observed a green Chevrolet Express van traveling westbound. He testified that he believed the van's license plate was not illuminated, which he considered a violation of Texas law, which requires a plate to be visible from fifty feet at night. He further stated that he turned off his headlights to "confirm" the tag-light issue before initiating a stop.

59.    After pulling over Armen, Pyle testified that the location and manner of the stop increased his suspicions. He claimed that Armen had pulled his van over into a "ditch off the shoulder... which was highly abnormal from the normal motoring public." He also testified that air fresheners, a mini-fridge, blankets, food wrappers, and travel items were visible inside the van, details that from his perspective, aligned with indicators of drug or human trafficking he had learned during interdiction training and following WCSO's policies and procedures. The prosecutor likewise repeatedly invoked "human trafficking" during questioning, despite the fact that "human trafficking" was not alleged in the indictment and presented no evidence linking Armen to any "human trafficking" offense, which further demonstrates the State's reliance on broad interdiction profiles rather than articulable facts relevant to the felony indictment at bar. Defense trial counsel objected to District Attorney McDonough's raising "human trafficking." This objection was sustained by the Court.

60.    Deputy Pyle further testified that he invited Armen to sit in the patrol car because of the cold weather and questioned him about his travel route, origin, and destination. Armen

stated he was returning to California from Arkansas, where he had been helping his father get things in order to start the family's real estate development in Arkansas.

61.    Armen also told Deputy Pyle he had approximately $2,000.00 to $3,000.00 in cash behind the driver's seat. Armen was forthcoming about why he had this cash which was because his bank card did not always work when he was traveling outside of California.

62.    On the stand, Deputy Pyle acknowledged that he issued only a written warning for the tag-light violation. Immediately afterward, he asked Armen for consent to search the van. Deputy Pyle testified that Armen immediately consented to the search.

63.    Notably, the body-worn camera footage shows that deputies conducted the search of the vehicle and handled the seized currency without wearing gloves or taking into account basic evidence-preservation procedures. This is consistent with a revenue-driven and interdiction-oriented culture of WCSO, which focuses on seizing currency from citizens rather than collecting reliable evidence of a crime.

64.    Deputy Pyle conceded that the roadside search yielded no narcotics, paraphernalia, residue, scales, weapons, or any items used in packaging or distributing narcotics. Despite this, he arrested Armen for money laundering without a warrant and transported him to jail and had the van driven to the WCSO facility for a more thorough secondary search.

65.    Under cross-examination, Deputy Pyle acknowledged that travelers routinely carry air fresheners, blankets, food wrappers, and personal belongings in their vehicle, which does not raise suspicion, and he repeatedly acknowledged that none of these factors he identified were illegal.

66.    He further admitted that he did not observe any sign of drug trafficking activity, and he did not see Armen attempt to hide anything, nor was contraband discovered. When

pressed on cross examination, he conceded that at the moment he arrested Armen, he was acting on mere suspicion rather than evidence of a crime.

67.    During the secondary search, they located approximately $2,000.00 behind the driver's seat, which is consistent with what Armen had already voluntarily disclosed when questioned in the patrol car.

68.    After completing the secondary search, Deputy Pyle arranged a "money-line" by placing the seized money in multiple boxes so that Deputy Cole's narcotics-detection dog, Grom, could examine the currency. Deputy Pyle admitted that the canine did *not* alert so as to indicate the presence of narcotics odor on any of the seized currency.

69.    Despite the dog's failure to alert on the cash or the inside of the van, Deputy Pyle maintained that, based on his "training and experience," the mere presence of a large sum of bundled currency is consistent with drug trafficking.

70.    Yet, while being cross examined, Deputy Pyle conceded that he had received no training on distinguishing legitimate cash from illicit cash; he could not identify any prior case involving cash packaged in the same manner, and could not cite any objective evidence linking the money to any criminal activity.

71.    Deputy Pyle did not testify that he had conducted any financial investigation into the origin of the seized currency; nor utilize any database or agency to verify the legitimacy of the cash; nor did he ask Armen any clarifying questions about the source of the money before arresting him without a warrant.

72.    Deputy Pyle further conceded that he ***did not*** observe Armen make ***any*** furtive gestures, evasive statements, or attempt to conceal from the deputies anything, including cash.

16

73.    Deputy Pyle further conceded that he ***did not*** observe ***any*** packaging materials, scales, ledgers, or residue that would indicate the presence of drugs inside the van. Moreover, he decided that because Armen's story was suspicious *to him*, the currency in the back of the van was alone sufficient to establish probable cause for a warrantless arrest.

74.    The emphasis on interdiction "training" functionally served to replace factual observation with profile-based assumptions rather than identifying concrete evidence of criminal activity. Deputy Pyle repeatedly recited generalized drug-corridor indicators and training-derived cues that were not tied to any illegal activity occurring during the stop but rather based his suspicion and arrest of Armen utilizing his WSCO training, polices and procedures.

75.    The record shows that every specific item that raised his suspicion of criminal activity, namely currency, blankets, air fresheners, clothing, and traveling on Interstate 40, was in fact entirely lawful. Nonetheless, Deputy Pyle contributed significantly to these ordinary items combined to establish a legal basis for arrest and prosecution due to his "training and experience".

## Testimony of Deputy Dale Cole

76.    Deputy Dale Cole appeared as the State's second witness. He testified in his capacity as WCSO's narcotic detecting canine handler.

77.    After Deputies Pyle and Havens transported Armen, the van, and the seized $122,000.00 to the WCSO facility, Deputy Pyle testified that he got in contact with Deputy Cole to come to the WCSO facility with the canine, Grom. Deputy Cole stated that he was responsible for deploying his trained detection dog, Grom, during narcotics investigations and interdiction activities along Interstate 40. He was asked to bring Grom to conduct a narcotics-odor evaluation of both the vehicle and the seized currency. He testified that Grom is certified to detect multiple

controlled substances and a non-alert indicates the absence of detectable narcotics odor on the money.

78.    He testified that he performed a free-air sniff around the exterior of the van, which the deputies had opened and closed the rear door without wearing gloves or following other evidence preservation practices. As Grom moved along the passenger-side rear door and fender area, the dog displayed a change in posture, breathing, and muscle tension that Deputy Cole claimed identified as an alert. No comparable alert behavior was observed elsewhere on the vehicle, and Deputy Cole testified that this was the only alert he recorded during the exterior sniff.

79.    Deputy Cole explained that a positive alert indicates only that a narcotics odor "has been or is" present in the location where the alert is given. He emphasized that such an alert does not establish the source of the odor or how long it has been present, or whether it indicates any criminal activity. Therefore, Deputy Cole expressly agreed that the said canine alert on a vehicle does *not* indicate whether a driver was in possession, transporting, selling or consuming narcotics.

80.    Again without wearing gloves to avoid any contamination, Deputy Cole directed Grom to complete a free-air sniff of a "money-line".  The money-line consisted of the seized currency, which was placed in boxes and arranged so that Grom could examine them. Deputy Cole testified unequivocally that Grom did **not** indicate a positive alert on the box containing the currency. Beyond the limited exterior alert, Deputy Cole did not identify any additional indicators of narcotics activity. He did not once reference or indicate that Grom performed a search of the interior of the vehicle, nor did he reference or indicate that Grom alerted to the

18

interior of the vehicle, nor did Deputy Cole testify to seeing any drug residue, paraphernalia, hidden compartments, or any packaging materials.

81.    Deputy Cole further testified that his role was confined to determining whether a narcotics odor was present. All relevant indicators, other than the single exterior alert, were negative. He also agreed that the seized currency did not produce any alerts that would support a conclusion that the money originated from narcotics trafficking or that Plaintiff was involved in any criminal conduct.

82.    It should be noted and is significant that a deputy who was wearing a bodycam turned away during Grom's exterior examination of the rear portion of the van, obscuring what occurred during this critical portion of the examination. Deputy Cole did not reference these actions, nor did he indicate that he was informed of them after conducting the canine search.

83.    Deputy Cole's testimony did not include any written notes, diagrams, or documentation explaining the deployment conditions, the sequence of Grom's movements, or the basis for his interpretation of the alleged alert. Further, he did not testify regarding Grom's reliability outside controlled training environments.

84.    His testimony did not indicate that he sought a confirmatory sniff from a second certified canine examination or that he consulted any supervisor regarding the exterior alleged alert. Nothing in his testimony suggested that any additional verification measures were undertaken, and the State's presentation rested entirely on his interpretation of Grom's single exterior alleged alert.

85.    Finally, he did not provide any testimony describing how the vehicle or the currency had been handled before his arrival. He offered no chain-of custody information and did not identify which deputies had opened or accessed the areas that Grom later examined. His

testimony was limited to his own deployment and did not include any explanation of the conditions created by the prior searches or handling of the van.

### Combined Analysis of Deputies Pyle and Cole Testimony

86.     When viewed together, the testimony of Deputies Pyle and Cole demonstrates the arrest and prosecution of Plaintiff were based not on evidence; probable cause or articulable facts. Instead, the arrest resulted from WCSO's interdiction-focused policies and forfeiture-driven practices. Deputy Pyle's "conclusory statements" stemmed almost entirely from interdiction training and profile-based assumptions. Deputy Cole, whose role was limited to detecting the odor of narcotics, provided no reliable findings that corroborated any suspicion of criminal conduct. In fact, Deputy Pyle testified that he merely observed normal items in Armen's van: air fresheners, blankets, food wrappers, and United States currency, which are *all* wholly lawful. Notwithstanding, in his testimony, Deputy Pyle repeatedly referred to his "training and experience" and "totality of the circumstances" and determined that a crime was afoot. Deputy Cole confirmed that the seized currency did *not* contain a detectable narcotics odor; because "Grom did not alert on the interior of the van." Deputy Cole's objective findings directly undermined the assumptions Pyle relied upon. These facts contradict Deputy Pyle's claim that the circumstances indicated drug trafficking or any criminal activity.

87.     Moreover, the alleged lone exterior alert that Deputy Cole identified carried little evidentiary value due to serious procedural and evidentiary deficiencies. The van and currency had been repeatedly handled by multiple deputies without gloves, contaminating the scene before Cole arrived. The body-worn camera footage shows deputies touching and moving items without gloves, compromising any odor-based detection and eliminating the reliability of a forensic evaluation. Deputy Cole provided no chain-of-custody testimony; did not know which deputies

20

had accessed the areas inspected by Grom; and did not attempt to control or verify the conditions of the deployment.

88.    The testimony also revealed significant documentation deficiencies. Cole produced no notes, diagrams, field reliability logs, and no documentation describing Grom's movements, the deployment conditions, or the basis for his interpretation of the alleged alert. He also did not request a confirmation sniff by another certified canine. Without documentation or corroboration, the State's case relied entirely on a single unverified and potentially contaminated exterior alert which did not connect Plaintiff to any criminal activity and did not establish probable cause.

89.    In addition, Deputy Pyle admitted key facts, which undermine any claim of probable cause: he found no narcotics, paraphernalia, packaging materials, scales, residue, ledgers, or tools of distribution. Further, he did not observe any evidence suggesting drug trafficking; he conducted no investigations into the origins of the currency; he did not run any financial checks, confirm Armen's account of the case, or ask follow-up questions. Deputy Pyle only made interdiction-driven "conclusory statements" and ultimately acknowledged that none of the facts he relied upon were illegal and that the arrest was based on suspicion rather than evidence. Their admissions expose that his decision to arrest was unsupported by any objectively articulable fact.

90.    Collectively, the testimony of both deputies confirmed that every objective indicator of narcotics activity was absent. The van contained no contraband; the money showed no detectable odor; the interior produced no alerts; Armen's statements were consistent and truthful; and no evasive behavior was observed. Every item Deputy Pyle cited as suspicious was lawful and not uncommon to be in a large van driving across the country. The deputies identified

no specific criminal offense; no illicit transaction; no source of illegal currency, and no evidence tying Armen to any criminal enterprise. Their conclusion rested solely on interdiction profiles and forfeiture-driven practices rather than evidence, reasonable articuable suspicion, or probable cause.

91.    In sum, the cumulative effect of the deputies' testimony shows that the arrest lacked probable cause from its inception and that the subsequent prosecution proceeded without any legitimate evidentiary basis. WCSO's interdiction culture, which emphasizes currency seizures; profile-based assumptions, and unconstitutional policing practices and procedures. Deputy Pyle substituted "training and experience" for factual inquiry, while Deputy Cole's objective finding directly contradicted the purported indicators Pyle relied upon. Together, their testimony demonstrated that the stop, search, arrest, and prosecution were driven by revenue incentives and interdiction profiling rather than by evidence of any criminal activity by Plaintiff.

92.    Finally, body-worn camera footage shows that upon arriving at WCSO, Armen asked Deputy Pyle why his property and currency were being seized, stating that he did not understand what crime had been committed. To this, Deputy Pyle responded that it's, "Just because this is the way we are doing it." This admission of Wheeler County's policies and procedures occurred before any investigation had been conducted, including before the money-line, the open-air sniff, or any attempt to verify the source of the funds, thus demonstrating that the decision to seize Plaintiff's property was made in advance of and independent from an evidentiary finding. Deputy Pyle's statement reflects a routine, policy-driven practice rather than an individualized assessment of criminal activity, which further confirms the existence of WCSO's revenue-driven forfeiture customs and procedures and underscores the unconstitutional manner in which Armen and his possessions were seized.

22

**WRONGFUL / UNREASONABLE ARREST / SEIZURE IN VIOLATION OF THE
FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION
(Pursuant to 42 U.S.C. § 1983)**

93.    Plaintiff re-alleges and incorporates all previous paragraphs herein by reference.

94.    The Fourth Amendment provides that "[t]he right of the people to be secure in their persons... against unreasonable... seizures, shall not be violated, and no warrants shall issue, but upon probable cause..."

95.    Plaintiff Armen Grigoryan was seized within the meaning of the Fourth Amendment when Defendants Deputy Timothy Pyle and Deputy Levi Havens placed him under arrest following a traffic stop on Interstate-40 in Wheeler County, Texas. At that moment a reasonable person in Plaintiff's position would not have felt free to leave, and Plaintiff's liberty was restrained by a show of official authority.

96.    The seizure of Plaintiff's person was unreasonable and unconstitutional because it was not supported by probable cause.

97.    Probable cause to arrest exists *only* when, at the time of the arrest, the facts and circumstance known to the officer would lead a reasonable person to believe that the arrestee has committed, is committing, or is about to commit a criminal offense.

98.    At the time Defendants seized Plaintiff, no such facts existed.

99.    Plaintiff voluntarily consented to a search of his vehicle. The search revealed no drugs, paraphernalia, residue, ledgers, weapons, scales or contraband indicative of illegal drug activity. Defendants also found no evidence linking Plaintiff, his vehicle, or the currency to any specific criminal activity.

23

100. During the search and secondary search, Defendants located currency in the rear cargo area of the van and behind the driver's seat. The presence of currency alone is not illegal, and Defendants uncovered no evidence that the currency was the proceeds of criminal activity.

101. A trained narcotics-detection canine was later deployed. The canine did not alert on the seized currency and did not alert on the interior of Plaintiff's vehicle. Thus, every objective indicator of narcotics activity was negative.

102. Plaintiff provided consistent, lawful, and non-evasive explanations regarding his travel, the purpose of his trip, and the presence of cash. Defendants did not observe furtive gestures, attempts to conceal evidence, false statements, or conduct indicative of criminal activity.

103. Despite the complete absence of articulable facts establishing probable cause, Defendants arrested Plaintiff immediately upon discovering the currency, demonstrating that the decision to arrest was based not on evidence, but on interdiction-based assumptions and pre-determined enforcement practices.

104. Defendants own statements and conduct reflected that the seizure of Plaintiff's person was effectuated and pursuant to customary interdiction and revenue-driven forfeiture practices, rather than an individual assessment of probable cause. As Defendant Pyle stated during the encounter, the seizure occurred, "just because this is the way we are doing it."

105. Accordingly, there were no facts or circumstances within Defendants' knowledge, nor any reasonable trustworthy information, sufficient to warrant a prudent person in believing that Plaintiff had committed the offense of money laundering or any other criminal offense at the time of the arrest.

106.    Defendants nevertheless effectuated a warrantless arrest without probable cause, in violation of Plaintiff's clearly established rights under the Fourth Amendment.

107.    This unreasonable seizure was the direct and foreseeable result of Wheeler County's and Wheeler County Sheriff's Office's interdiction and revenue-driven-focused policies, customs, training deficiencies, and ratification of unconstitutional seizure practices, as more fully alleged in the *Monell* section below.

108.    As a direct and proximate result of Defendants' unconstitutional seizure, Plaintiff suffered substantial damages, including but not limited to: loss of liberty; unlawful detention; loss of property; economic loss; lost business income and opportunities; attorney's fees and legal expenses; reputational harm; humiliation; emotional distress; mental anguish; pain and suffering; and other damages alleged herein.

### MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH AND/OR FOURTEENTH AMENDMENT(S) TO THE UNITED STATES CONSTITUTION
### (Pursuant to 42 U.S.C. § 1983)

109.    Plaintiff re-alleges and incorporates all previous paragraphs herein by reference.

110.    Defendants Deputy Timony Pyle, Deputy Levi Havens, and Deputy Dale Cole acting under color of state law and within the scope of their employment with Wheeler County and/or Wheeler County Sheriff's Office, initiated, caused and continued the criminal proceedings against Plaintiff by arresting him without probable cause; executing a materially misleading Probable Cause Affidavit, and supplying false; incomplete and misleading information to the District Attorney and the Court.

111.    While Plaintiff remained seated in the patrol vehicle, deputies searched the van with his consent and located bundled currency in trash bags. No drugs, paraphernalia, ledgers, residue, weapons, or contraband were discovered. Upon finding the currency, Deputy Havens

stated, "Ahh fuck yeah, big money load," and high-fived Deputy Pyle. Immediately following the discovery of the currency, Deputies arrested Plaintiff despite the complete absence of evidence establishing probable cause for any offense.

112.    Deputy Pyle thereafter executed and swore to a Probable Cause Affidavit that omitted material exculpatory facts and asserted a criminal nexus he knew did not exist (see Exhibit A). By doing so, he initiated civil forfeiture of the currency seized from Mr. Grigoryan and also began to prosecute him criminally. Among other omissions, the affidavit failed to disclose that no contraband, illegal substances, or any indication of the same was found in the van or on Armen's person. Further, Armen's explanation of the cash was consistent with what the WCSO found. Moreover, in his probable cause affidavit, Deputy Pyle failed to state that the canine, Grom, did not alert on the money-line, or that Armen is the General Manager of his family's multimillion-dollar automotive chemical distribution company.

113.    Deputy Cole likewise contributed to the initiation and continuation of the prosecution by providing materially incomplete and misleading information regarding the canine deployment. Deputy Cole testified as a state witness and omitted critical facts undermining probable cause. Among other omissions, he made statements that directly undermined any probable cause, such as:

      a.  that the trained narcotics-detection canine did not alert on the seized currency;

      b.  that no narcotics odor was detected on any relevant item;

      c.  that any exterior alert occurred only after repeated officers' handling of the vehicle;

      d.  that no forensic or physical evidence tied Plaintiff to narcotics activity; and

e.  that the examination did not support any inference that the money was drug proceeds.

114.    Defendants Pyle, Havens, and Cole knew or should have known that no articulable facts established a nexus between Plaintiff, the seized currency, and any specific criminal offense. Nonetheless, they caused Plaintiff to be arrested, charged, prosecuted, and convicted based solely on unsupported suspicions, interdiction profile assumptions, and omitted exculpatory facts.

115.    The criminal proceedings against Plaintiff were ultimately terminated in his favor. The Seventh Court of Appeals of Texas *reversed* the conviction and *rendered an acquittal* based on legal insufficiency of the evidence, holding that the State failed to establish the elements of money laundering (see Exhibit B).

116.    The foregoing conduct deprived Plaintiff of clearly established rights under the Fourth and Fourteenth Amendments, including the right to be free from seizure pursuant to legal process unsupported by probable cause, the right not to be prosecuted on false, fabricated, or incomplete evidence, and the right to due process of law.

117.    As a direct and proximate result of Defendants' malicious prosecution, Plaintiff was falsely arrested; wrongfully prosecuted; forced to endure an unfair criminal trial; unjustly convicted; subjected to the imposition of an eight-year sentence and an $8,000.00 fine; suffered severe economic losses, lost business opportunities, reputational harm, emotional distress, humiliation, and other damages described herein.

## Malicious Prosecution Under Texas Common Law

118.    Plaintiff re-alleges and incorporates all previous paragraphs herein by reference.

27

119.    This claim is brought pursuant to Texas common law against Defendants Sheriff Reeves, District Attorney Franklin McDonough, Deputy Timothy Pyle, Deputy Levi Havens, and Deputy Dale Cole, each of whom acted willfully, knowingly, and maliciously, and without probable cause in initiating, procuring, or continuing a criminal prosecution against Plaintiff.

120.    Texas law recognizes the tort of malicious prosecution and provides a cause of action where a criminal proceeding is initiated or procured without probable cause and with malice, later terminated in the accused's favor. *Richey v. Brookshire Grocery Co.,* 952 S.W.2d 515, 517 (Tex. 1997); *Armstrong v. Ashley,* 60 S.W.3d 883, 886-87 (Tex. App.- Amarillo 2001, no pet.).

121.    Defendants Deputies Pyle, Havens, and Cole initiated and procured the criminal prosecution against Plaintiff by:

   a.   arresting Plaintiff without probable cause;

   b.   swearing to a Probable Cause Affidavit that omitted material exculpatory information;

   c.   asserting a nonexistent criminal nexus between Plaintiff and narcotics activity;

   d.   providing incomplete, misleading, or false statements to prosecutors, and

   e.   testifying in a manner calculated to influence and sustain the prosecution.

122.    Deputy Havens initiated the arrest by exclaiming, *"Ahh fuck yeah, big money load,"* immediately placing Plaintiff in custody even though no contraband, no drugs, no weapons, and no illegal activity had been observed indicating a motive based on seizure of currency, not evidence of crime.

123.    Deputy Pyle procured and continued the prosecution by preparing and swearing to a Probable Cause Affidavit that knowingly omitted crucial exculpatory information, including:

the absence of narcotics or paraphernalia, the negative canine examination results regarding the currency, the lawful explanations provided by Plaintiff, and the lack of articulable facts suggesting criminal conduct. But for the false and misleading investigatory reports, prosecutors, exercising due diligence, would not have pursued charges.

124.    Deputy Cole procured and continued the prosecution by offering testimony that materially overstated or mischaracterized the significance of a single unreliable exterior canine alert while failing to disclose, or affirmatively downplaying, the far more probative fact that the dog did not alert on either the interior of the van or the seized currency taken from the interior of the van. Deputy Cole's testimony was relied upon by the prosecutor and court in continuing Plaintiff's prosecution.

125.    The criminal proceedings were terminated in Plaintiff's favor on December 20, 2023, when the Seventh Court of Appeals *reversed* the conviction and *rendered an acquittal* based on legal insufficiency of the evidence, holding that the state failed to prove beyond a reasonable doubt a nexus between the currency and the sale of narcotics.

126.    At no time did Defendants Deputies Pyle, Havens, or Cole have probable cause to believe that Plaintiff was committing any criminal offense. No evidence, direct or circumstantial, connected Plaintiff or the currency to narcotics trafficking or any other illicit activity. All objective indicators were absent.

127.    Defendants acted with malice, as defined under Texas law, because they initiated and continued the prosecution for an improper purpose, including:

      a.    Seizing forfeiture revenue for Wheeler County;

      b.    Reliance on interdiction "profiles" and revenue-driven customs rather than facts;

      c.    Knowingly omitting exculpatory facts;

d.   Continuing the prosecution despite the absence of probable cause.

128.   Texas law defines malice in the malicious-prosecution context as "conduct motivated by ill will, wrongful or evil motive, or undertaken in reckless disregard of the rights of another". *Richey*, 952 S.W.2d at 517. The record demonstrates that each Defendant acted with malice.

129.   As a direct and proximate result of Defendants' malicious acts, Plaintiff was wrongfully arrested, wrongfully prosecuted, wrongfully convicted and wrongfully incarcerated. Plaintiff suffered severe damages, including economic loss, emotional distress, harm of reputation, loss of business income and opportunity, mental anguish, loss of property, legal expenses, and other damages fully described herein.

130.   Defendants, Sheriff Reeves, Deputies Pyle, Havens, and Cole are individually liable for these torts under Texas law. Governmental immunity under the Texas Tort Claims Act does not shield individual employees from liability for intentional torts such as malicious prosecution. Tex. Civ. Prac. & Rem. Code § 101.057(2).

131.   Accordingly, Plaintiff seeks judgment against Defendants Sheriff Reeves, Deputies Pyle, Havens, and Cole and District Attorney McDonough for all damages available under Texas law, including actual damages, mental-anguish damages, reputational damages, economic damages, exemplary damages, costs of suit, and all other relief to which Plaintiff is entitled.

### *Monell* Liability
### (Pursuant to 42 U.S.C. § 1983)

132.   Plaintiff re-alleges and incorporates all previous paragraphs herein by reference.

133.   There is an affirmative causal nexus between the violation of Plaintiff's Fourth and Fourteenth Amendment rights and established policies, practices, customs, failures to train,

failures to supervise, and ratifications maintained by Wheeler County and/or the WCSO. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

134.    Under Texas law, the County Sheriff is the final policymaker for all matters involving law enforcement, highway interdiction, arrests, searches, seizures, probable-cause documentation, training, supervision, discipline, and the operation of the Sheriff's Office. *Turner* at 136.

135.    Because the Sheriff is Wheeler County's final policymaker for enforcement, his decisions, failures, omissions, ratifications, and training deficiencies constitute official County policy for the purpose of § 1983 municipal liability. *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996); *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc).

136.    Thus, any unconstitutional customs, patterns, interdiction practices, seizure policies, or documentation practices originating from the Sheriff or tolerated by him are legally attributable to Wheeler County under *Monell*. *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003).

137.    Further, Defendant Franklin McDonough, as the elected District Attorney for the 31st Judicial District of Texas, including Wheeler County, acted as the final policymaker for prosecutorial charging decisions, evidence evaluation, training, supervision, and disclosure practices within the District Attorney's Office.

138.    Wheeler County, acting through the District Attorney's Office, routinely participated in and exercised administrative and supervisory oversight over criminal investigations initiated by law enforcement officers, including the review of probable-cause

affidavits, evaluation of evidentiary sufficiency, charging decisions, and the continuation of prosecutions.

139.    The 31st District Attorney's Office maintained policies, customs, and practices of initiating and continuing criminal prosecutions without probable cause by relying on materially incomplete, misleading, or fabricated investigative narratives—while failing to require meaningful verification of facts, correction of false affidavits, and disclosure of exculpatory information.

140.    The District Attorney's Office further maintained a policy, custom, or practice of purporting to conduct good-faith evidentiary review and prosecutorial screening, when in fact it routinely conducted no meaningful investigation into the factual basis for arrests, seizures, or interdiction-based prosecutions. Despite this, prosecutors would falsely represent to courts that charges were supported by probable cause and admissible evidence.

141.    In exercising these administrative, supervisory, and investigative functions, the District Attorney's Office acted deliberately, recklessly, or with deliberate indifference to the constitutional rights of criminal defendants, including the right to be free from prosecution unsupported by probable cause and the right to due process of law.

142.    These practices were widespread, persistent, and well-established before and during Plaintiff's prosecution. They were carried out by the District Attorney's Office and persisted with Defendant McDonough's actual or constructive knowledge, ratification, and acquiescence.

143.    As demonstrated in Plaintiff's case, prosecutors proceeded with criminal charges despite:

        a.   the complete absence of narcotics, contraband, or forensic evidence;

        b.   negative canine results on seized currency;

       c. consistent and lawful explanations for the currency;

       d. materially misleading probable-cause affidavits and the absence of any nexus between Plaintiff and criminal activity.

144. Yet, the District Attorney's Office failed to dismiss charges, correct false narratives, or intervene to prevent an unconstitutional prosecution.

145. Defendant McDonough, as a final policymaker, had actual notice that he routinely relied on interdiction profiles, speculative testimony, and incomplete affidavits in initiating and sustaining prosecutions. Despite this notice, he ratified the lacking of WCSO's training, supervision, discipline, policies, and implementation of corrective measures.

146. To the extent any policies governing prosecutorial review, disclosure obligations, or evidentiary sufficiency existed, Defendant McDonough had actual or constructive notice that such policies were routinely ignored or unenforced. These deficiencies posed an obvious and substantial risk of wrongful prosecution and deprivation of liberty.

147. With deliberate indifference to the rights of criminal defendants, District Attorney McDonough and Wheeler County chose not to adopt, implement, or enforce minimally adequate safeguards to ensure that prosecutions were supported by probable cause and constitutionally sufficient evidence.

148. The unconstitutional policies, customs, and practices of the District Attorney's Office were the moving force and "but for" cause behind Plaintiff's wrongful prosecution, conviction, incarceration, and resulting damages, thereby subjecting Wheeler County to liability under *Monell at* 658.

149. When a Sheriff, as Wheeler County's final policymaker for law enforcement, fails to discipline, investigate, or correct deputies following unconstitutional conduct, such inaction may constitute ratification and thus an official County policy, as set out in *Monell*.

150. This case fits squarely within the narrow range of circumstances the Supreme Court recognized in *Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d. 412 (1989), where a pattern of prior violations is unnecessary. What *Canton* described as arming officers with firearms and sending them into the public to capture fleeing felons without teaching the constitutional limits on deadly force has effectively made a deliberate choice to disregard the obvious need for such training. In that situation, the need for training is so "obvious," and the consequences of failing to provide it so "highly predictable," that constitutional violations are inevitably the product of the municipality's decisions.

151. That is precisely the situation at bar, although defendant Wheeler County did not arm its deputies with rifles, but rather the WCSO deputies were armed with highway-interdiction tactics; criminal-interdiction techniques, and drug courier and human-trafficking "profiles." Then, just as in the *Canton* hypothetical, it deployed those officers into the public without training them on the constitutional limits of the Fourth Amendment.

152. These consequences were equally obvious and equally predictable. Without any required constitutional instruction and training, the deputies predictably used these aggressive interdiction tools against innocent travelers, which resulted in the arrest of law-abiding citizens, the indictment of law-abiding citizens, and the seizure of law-abiding citizens and their property. Thus, these acts of the WCSO were all without the reasonable suspicion or probable cause that the Fourth Amendment demands.

153. As *Canton* explains, when a municipality trains officers how to use powerful law enforcement tools but fails to train them on the constitutional limits governing those tools, the resulting constitutional violations cannot be attributed solely to the individual officer. They are the obvious plainly foreseeable result of the municipality's deliberate indifference and therefore,

34

attributable to the county under *Monell. Canton*, 489 U.S. at 390; *Brown v. Bryan Cty.*, 219 F.3d 460, 462-63 (5th Cir. 2000)

154.    Defendants, Wheeler County and WCSO, maintained the following unconstitutional policies, practices, and custom,s including:

    a.    A failure to adequately train and/or supervise WCSO deputies regarding Fourth Amendment limits governing traffic stops, searches, detentions, arrests, and probable cause determinations;

    b.    A failure to adequately train and/or supervise deputies regarding the constitutional requirements for probable cause to arrest;

    c.    A failure to adequately train and/or supervise WCSO deputies, including Sheriff Tim Reeves (in his official capacity), Deputy Cole, Deputy Havens, and Deputy Pyle, with respect to proper and truthful documentation of probable cause through probable cause affidavits, including affidavits utilized by prosecutors to initiate criminal proceedings against citizens;

    d.    A specific failure to adequately train and/or supervise WCSO Deputies, including Sheriff Tim Reeves, Deputy Cole, Deputy Havens, and Deputy Pyle, to not omit exculpatory information from probable case affidavits and investigative reports relied upon by prosecutors to make charging decisions;

    e.    A pattern, practice and custom of WCSO Deputies seizing/arresting persons without probable cause and arresting citizens without a warrant when no exception to warrantless arrest exists;

    f.   An established pattern, practice, and custom of WCSO deputies omitting exculpatory information from probable cause affidavits and other documents submitted to prosecutors and courts;

    g.   A failure to reprimand or discipline thus ratifying the conduct of deputies who violated the Fourth Amendment rights of citizens.

155.   These policies and customs were closely related to the violation of Plaintiff's constitutional rights.

156.   WCSO I-40 Currency Seizure "Interdiction" and Forfeiture Revenue Customs:

    a.   A practice of treating mere presence of currency without drugs, contraband, odor, alerts, or corroborating evidence as sufficient justification to prolong detentions; conduct invasive searches and effect arrests or initiate prosecutions;

    b.   A longstanding custom of using pretextual traffic stops along Interstate-40 to target out-of-state motorists for investigative searches unrelated to legitimate traffic safety purposes.

    c.   A policy, practice, and custom of encouraging or incentivizing deputies to seize currency for financial benefit of Wheeler County making forfeiture revenue, rather than legitimate evidence, the driving force for arrest and prosecutions.

157.   The interdiction and forfeiture and customs described above were closely related to and were the moving force that directly caused the violation of Plaintiff's constitutional rights, *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)(en banc).

158.   The County's officials acted with "deliberate indifference".

159.    "Deliberate Indifference," on the governmental level, may be satisfied when the municipality/county has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. Deliberate indifference is defined differently for Eighth Amendment and municipal liability purposes. In a prison condition or context deliberate indifference is a subjective standard requiring actual knowledge of a risk by the official. Contrastingly, in the municipal liability context, deliberate indifference is an objective standard that is satisfied if the risk is so obvious that the official *__should__* have known of it.

160.    Here, the risk in maintaining the above-described policies and customs was so obvious that it amounted to deliberate indifference to the rights of persons with whom WCSO came into contact. Put another way, the risk accompanied by maintaining the above-described policies and customs was so obvious that WCSO *__should__* have known it.

161.    As a direct and proximate result of the above-described policies and customs, Plaintiff suffered damages, including, but not limited to, economic and personal losses (including, but limited to lost wages, lost business opportunities and attorney fees) irreparable damages to his reputation; humiliation; emotional distress; pain and suffering and the damages alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE,** based on the foregoing, Plaintiff prays that this Court grant him the relief sought including, but not limited to, actual, compensatory, and punitive damages in excess of Seventy-Five Thousand Dollars ($75,000), with interest accruing from date of filing of suit, the cost of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully Submitted,

**DENNIS R. BOREN**

Dennis R. Boren, TBA #02665500
4000 S. Georgia, Suite A
Amarillo, Texas 79109
P: (806) 206-8180
F: (806) 214-5943

*Attorney for Plaintiff*

EXHIBIT A

## PROBABLE CAUSE AFFIDAVIT

STATE OF TEXAS
COUNTY OF Wheeler

Comes now, Timothy Pyle, and upon oath says:

My name is Timothy Pyle. I have good reason to believe and do believe, based on the following information, that **Armen Alex Grigoryan**, White Male, date of birth- 08/17/1982, committed the offense of **Sec.34.02(e)(2) (Penal Code), Money Laundering >=$30K<$150K. (Felony 3)**

My belief is based on the following

1. On November 24, 2021, at approximately 2243 hours, I, Wheeler County Deputy Timothy Pyle was working my patrol shift in full police uniform driving a fully marked patrol vehicle riding 2-man with Deputy Levi Havens. I observed a dark in color van traveling west bound on Interstate 40.

2. I observed the rear of the vehicle as it was passing by my patrol vehicle and I noticed that it did not have working license plates lights. I conducted a traffic stop on the vehicle for the violation of no license plate light.

3. The vehicle was identified as a green in color Chevy Express van bearing California license plate 5HWP179. I made a passenger side approach to the vehicle and made contact with a male who was identified as Armen Grigoryan. I asked Armen to come to the passenger seat of my vehicle so that I could issue his warning for the violation.

4. While sitting in the front seat of my passenger seat, I noticed several indicators of nervousness and potential criminal activity. I asked Armen if there were any drugs in the vehicle and was told no. When I asked about marijuana, cocaine, heroin and meth Armen told me no and that he does not do any of that. I then asked about large sums of US currency over 10,000 dollars. Armen advised that there was not any money over 10 thousand in the car. Armen told me that he did have about 3 thousand dollars for trip money. I asked Armen why he had 3 thousand dollars in cash and not in his bank account, and he told me because when he travels that his card gets shut off. I asked Armen if I could search his vehicle and he told me yes. Armen told me that the 3 thousand dollars he had was behind the seat in the vehicle.

5. Havens and I began to conduct a consent search of the vehicle where I observed several Black-Ice air fresheners throughout the vehicle. I got into the vehicle and in the back cargo area of the van I opened up a 5-gallon white in color trash bag and discovered several bundles of US currency that was primarily 20 dollar increments and rubber banded together with rubber bands which is common with proceeds of criminal activity.

6. Havens read Armen his Miranda rights and asked him about the money. Armen advised that he had no idea where that money came from and he had never seen it before. Armen stated that his dad may have left it in the vehicle. Havens placed Armen into handcuffs and

1

drove the van to the Sheriff's Office.  I transported Armen to the jail for booking without incident.

7.  Total cash while at the Sheriff's Office was counted out to approximately $122,000.

Subscribed and sworn before me this the _24_ day of _____November_____,
___2021___ A.D

_J. Castaneda_
Notary Public in and for the State of Texas

JAZMINE CASTANEDA
Notary Public, State of Texas
My Commission Expires
January 21, 2025
NOTARY ID 18288049-9

2

EXHIBIT B



In The
## Court of Appeals
### Seventh District of Texas at Amarillo

---

No. 07-23-00046-CR

---

ARMEN ALEX GRIGORYAN, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

---

On Appeal from the 31st District Court
Wheeler County, Texas
Trial Court No. 5536, Honorable Steven R. Emmert, Presiding

---

December 21, 2023

## MEMORANDUM OPINION

Before QUINN, C.J., and DOSS and YARBROUGH, JJ.

Following a plea of not guilty, Appellant, Armen Alex Grigoryan, was convicted by the trial court of money laundering with funds valued at $30,000 or more but less than $150,000, a third degree felony.[1]  He was sentenced to eight years' confinement and assessed an $8,000 fine.  Appellant challenges his conviction by three issues contending (1) the evidence is insufficient, (2) trial counsel was ineffective, and (3) he was denied a

---

[1] TEX. PENAL CODE ANN. § 34.02(e)(2).

fair trial by not having a neutral and detached factfinder. The State did not favor this Court with a brief. We reverse and render.

## BACKGROUND

Appellant and his father, originally from Armenia, reside in California. Appellant is the general manager of his father's profitable automotive oil distribution business. In November 2021, he and his father traveled to Arkansas in a van belonging to Appellant's brother to hire contractors for an investment property.[2] After they arrived in Arkansas, Appellant's wife called him and insisted he return home for Thanksgiving. Complying with his wife's request, Appellant left his father in a motel and began the drive to California on Interstate 40. While traveling through Wheeler County, Texas, he was stopped for a traffic violation. Appellant stopped the van beyond the shoulder of the road near a ditch.

The deputy who initiated the stop became suspicious Appellant was involved in human trafficking because he was the sole passenger in a van. He began issuing a warning for the traffic violation and questioned Appellant about his travels and whether he had anything illegal with him or any amounts of money. According to the deputy, Appellant told him he was traveling from Arkansas to California, disclosed he had approximately $2,000 to $3,000 in cash, and denied having any contraband. Appellant explained he traveled with cash because his bank card was sometimes inoperable.

After the deputy issued the warning, he asked if he could search the van to which Appellant consented without hesitation. The deputy's suspicion was piqued because

---

[2] Appellant testified he accompanied his father because of his health issues and inability to speak English well.

Appellant had pulled off the road beyond the pavement which he described as "highly abnormal from the motoring public." He was also suspicious of air fresheners in the van, and he doubted Appellant's travel itinerary.

During a search of the van at the scene, the deputy observed an empty mini-fridge, a bag of chips, food wrappers, blankets, an air mattress, and two five-gallon trash bags in the rear of the van which contained clothing and cash totaling $122,000. The cash was bundled by rubber bands. Based on his training and experience, the deputy read Appellant his rights and arrested him for money laundering.

Appellant and the van were transported to the jail. A secondary search of the van revealed $2,000 behind the driver's seat which Appellant had previously disclosed, but he denied any knowledge of the cash in the trash bags.

A K-9 deputy and his trained narcotics dog were asked to "run a money line" which involved placing the confiscated cash in various boxes to determine whether the odor of narcotics was present on the cash. The dog did not alert on any of the boxes.

The dog was then tasked with detecting the odor of narcotics on the exterior of the van.[3] The K-9 deputy testified the dog "showed interest" by the back passenger door and rear fender wheel area. He explained that a positive alert indicated narcotics were in the van at some point. However, no drugs, paraphernalia, or illegal contraband were found in the van or on Appellant.

---

[3] The van was in an enclosed sally port at the time of the K-9 search.

3

Appellant was indicted for "knowingly possess[ing] the proceeds of criminal activity, namely *selling a controlled substance* . . . ." (Emphasis added). At a bench trial, the State presented the arresting deputy as a witness and the K-9 deputy as an expert witness. The arresting deputy, constantly prefacing his answers with his "training and experience" and "totality of the circumstances,"[4] testified that traveling on Interstate 40, a known drug corridor, with air fresheners, food wrappers, blankets, and a large amount of cash were indicators of drug trafficking. He also disbelieved Appellant's reason for traveling between California and Arkansas in a short period of time. During cross-examination, however, he conceded it was not illegal to drive with air fresheners, possess bundled cash, or travel along Interstate 40 between California and Arkansas. He also conceded that at the time of the stop, he was merely suspicious. He agreed he did not find any indicia of drug dealing such as ledgers, scales, or baggies, and Appellant was not in a suspicious place at the time of his arrest.

The K-9 deputy, testifying as an expert for the first time, explained his dog's training and confirmed the dog did not alert on the money line but did alert on the exterior of the van. During cross-examination, when asked if a positive alert on the van could distinguish between possession or sale of narcotics, the deputy answered, "so my K-9 alerting on the vehicle would not indicate that he was in possession, transporting, selling, consuming."

Appellant testified in his own defense. When he and his father began their journey, his father loaded the van first and then picked him up. Appellant was unaware of the

---

[4] "Totality of the circumstances" was invoked over a dozen times prompting defense counsel to ask that the record reflect the prosecutor was coaching the deputy by nodding his head and in a separate instance stating "you can say totality of the circumstances all you want. I'm sure you talked to counsel about that."

4

trash bags of cash when he loaded his belongings which were in a plastic grocery type bag. He believed the cash in the trash bags belonged to his father because his father distrusted banks and needed cash to hire contractors in Arkansas.[5] He explained he was in Arkansas for only a short time because his wife insisted he return to California for Thanksgiving.

Appellant's father, through a translator, testified and claimed ownership of the cash bundled in rubber bands. He explained he bought the property in Arkansas as an investment and planned to hire contractors to develop the property.

At the conclusion of the testimony, the trial court found Appellant guilty. After a very brief punishment phase, the trial court sentenced Appellant to eight years' confinement and assessed an $8,000 fine.

ISSUE ONE—SUFFICIENCY OF THE EVIDENCE

Appellant contends his conviction for money laundering is based on mere speculation regarding a large amount of cash rendering the evidence insufficient to support his conviction. We agree.

The State was required to prove Appellant knowingly possessed proceeds of criminal activity in an amount of $30,000 or more but less than $150,000. TEX. PENAL CODE ANN. § 34.02(a)(1), (e). "Proceeds" are funds acquired or derived directly or indirectly from, produced through, or realized through some criminal activity. § 34.01(4).

---

[5] Appellant's father's distrust was the result of financial dealings with banks in Armenia.

5

"Criminal activity" is defined as any offense, including a preparatory offense, classified as a felony. *Id.* at (1)(A).

The only standard a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense the State is required to prove beyond a reasonable doubt is the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). *See Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). We consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

We give deference to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). Each fact need not point directly and independently to the appellant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Id.*

Appellant relies heavily on this Court's decision in *Deschenes v. State*, 253 S.W.3d 374, 386 (Tex. App.—Amarillo 2008, pet. ref'd), in which the appellant's conviction was reversed and a judgment of acquittal rendered under strikingly similar circumstances. Deschenes was driving a rental car and was stopped for speeding on Interstate 40, a route known by the trooper to be used by drug smugglers. *Id.* at 376–77. The trooper

6

became suspicious when he observed empty beverage containers and food wrappers which gave the car's interior a "lived-in" look. He also detected Deschenes was nervous. He disbelieved Deschenes's travel destination. After he was issued a warning, Deschenes gave consent for a search of the car. No evidence of drugs or contraband was found in the car's interior but when the trooper searched the trunk of the car, he observed three pieces of luggage—one contained clothing and hygiene items, a second was empty, and a smaller bag contained bundles of cash held together by rubber bands. Appellant admitted, "Okay, I lied." *Id.* The trooper also found scales in one of the bags. *Id.* at 377. A DPS canine was called to run the car. The canine did not alert to the interior or exterior but did alert to the small bag containing the cash and the large empty bag. *Id.* Deschenes was arrested and convicted for money laundering.

During trial, the State referenced "drug trafficking" and "drug smuggling" but did not connect Deschenes and the cash to an identified felony.[6] *Id.* at 378. To prove its case, the State relied on the trooper's testimony that drug proceeds "shipped to the east come back westbound to either the originator who sent the drugs or someone that's going to purchase narcotics or weapons or whatever the contraband may be." *Id.* at 381. This Court found the trooper's testimony "speculative" and without probative value without a connection between the cash and drug trafficking. *Id.* For a money laundering conviction to stand, "there must be direct or circumstantial evidence of a temporal connection, or nexus, between the money and some criminal activity." *Id.*

---

[6] The indictment charging Deschenes was defective because it did not specify a particular felony, but he waived the issue on appeal. At trial, however, the State argued the cash came from "sales and trafficking in narcotics." *Deschenes*, 253 S.W.3d at 380.

As in the case before us, in *Deschenes*, the State relied on numerous profiling characteristics and a positive alert by a narcotics canine to establish a connection between the cash and criminal activity. This Court found such "evidence" to be mere conjecture." *Id.* at 382–83. No credible evidence was presented to infer Deschenes was involved in a drug transaction, sale, or delivery at or around the time of his arrest for money laundering. *Id.* at 385. He had no prior conviction related to drugs, no relationship with drug trafficking, and he did not attempt to hide the cash in packaging designed to prevent its detection. *Id.*

In the underlying case, the State similarly used profiling characteristics to justify charging Appellant with money laundering. Unlike the scales found in *Deschenes* and his admission that he lied, here, the arresting deputy admitted Appellant told the truth about the $2,000 that was found behind the driver's seat and that he was not carrying anything illegal in the van. Thus, the evidence in this case is weaker than the evidence presented in *Deschenes*.[7]

Appellant testified the van belonged to his brother and he used it "just a little bit." He testified he has never been involved in the narcotics business. He acknowledged a misdemeanor theft conviction in 2003 but did not have any felony convictions. The K-9 deputy testified the positive alert on the van did not indicate Appellant was involved in the sale of narcotics—the specific offense charged as the criminal activity element of money

---

[7] Under the doctrine of horizontal *stare decisis*, this Court must follow materially indistinguishable decisions of earlier panels of the same court unless a higher authority has superseded that prior decision. *See Mitschke v. Borromeo*, 645 S.W.3d 251, 256 (Tex. 2022). *Deschenes* has not been superseded by this Court or the Court of Criminal Appeals.

laundering. The State failed to prove beyond a reasonable doubt a nexus between the cash found in the trash bags and the sale of narcotics. Appellant's first issue is sustained.

Our disposition of issue one pretermits consideration of his remaining two issues.

### CONCLUSION

The trial court's judgment is reversed, and a judgment of acquittal is hereby rendered.

Alex Yarbrough
Justice

Do not publish.

9

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Grigoryan, Armen A.

## DEFENDANTS

Wheeler County, a political subdivision of Texas; 31st District Attorney's Office, McDonough, Franklin, in his offici[+]

**(b)** County of Residence of First Listed Plaintiff    Los Angeles County, Ca
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Wheeler County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Dennis R. Boren Attorney at Law, 4000 S. Georgia,
Amarillo, TX, 79109, and 806-206-8180

Attorneys *(If Known)*

Slater C. Elza

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | |
| ☒ 3 | Federal Question *(U.S. Government Not a Party)* | |
| ☐ 2 | U.S. Government Defendant | |
| ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*     *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | **INTELLECTUAL** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other ☐ 550 Civil Rights | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer |
| | | | | | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*
42 U.S.C. § 1983

Brief description of cause:
Civil rights action under 42 U.S.C. § 1983 for unconstitutional traffic stop, warrantless arrest, unlawful seizure of property, malicious prosecution, and

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
10,000,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE   Steven Emmert    DOCKET NUMBER 31st DC Wheeler County #5536

DATE
12/19/2025

SIGNATURE OF ATTORNEY OF RECORD
s/ Dennis R. Boren

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a)  **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b)  **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c)  **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.  **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)

III.  **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.  **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V.  **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI.  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII.  **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.  **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If a related case exists, whether pending or closed, insert the docket numbers and the corresponding judge names for such cases. A case is related to this filing if the case: 1) involves some or all of the same parties and is based on the same or similar claim; 2) involves the same property, transaction, or event; 3) involves substantially similar issues of law and fact; and/or 4) involves the same estate in a bankruptcy appeal.

**Date and Attorney Signature.** Date and sign the civil cover sheet.